## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## PINE BLUFF DIVISION

JIMMY R. HEIKKILA                                                      PLAINTIFF
ADC #122299

V.                                  5:16CV00299-BSM/JTR

WENDY KELLEY, Director,
Arkansas Department of Correction;
RANDY WATSON, Warden,
Varner Unit, ADC; and
JOSHUA MAYFIELD,
Administrator of Religious Services, ADC                          DEFENDANTS

## RECOMMENDED DISPOSITION

The following Recommended Disposition ("Recommendation") has been sent
to Chief United States District Judge Brian S. Miller. You may file written objections
to all or part of this Recommendation. If you do so, those objections must: (1)
specifically explain the factual and/or legal basis for your objection; and (2) be
received by the Clerk of this Court within fourteen (14) days of the date of this
Recommendation. If you do not file objections, Judge Miller can adopt this
Recommendation without independently reviewing all of the evidence in the record.
By not objecting, you may waive the right to appeal questions of fact.

### I.  Introduction

Plaintiff Jimmy R. Heikkila ("Heikkila") is a prisoner in the Varner Unit of
the Arkansas Department of Correction ("ADC"). He claims Native American

ancestry and professes faith in Native American Religion ("NAR"). He has filed this *pro se* action alleging that Defendants have burdened his ability to practice NAR and, in doing so, violated his First and Fourteenth Amendment rights, as protected by 42 U.S.C. § 1983, and the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc-1 ("RLUIPA").

In his Complaint, Heikkila alleged that Defendants ADC Director Wendy Kelley ("Kelley"), Warden Randy Watson ("Watson"), and ADC Religious Services Administrator Joshua Mayfield ("Mayfield") violated his free exercise rights, under the First Amendment and RLUIPA, when they denied his requests to: (1) construct and use a sweat lodge; (2) smoke a ceremonial pipe; (3) possess a headdress, headband and eagle feather; and (4) meet with a religious advisor. *Doc. 2-1, at 5*.

In his Amended Complaint, Heikkila alleged that Defendants violated his Fourteenth Amendment equal protection rights by denying NAR services, rituals and artifacts, but allowing Catholic, Christian and Muslim inmates to attend religious services, engage in religious rituals, and possess religious artifacts. *Doc. 13*.

By way of relief, Heikkila requested declaratory and injunctive relief allowing: (1) the construction and use of a sweat lodge; (2) the use of ceremonial pipes, tobacco, and headband/headdress; and (3) access to a NAR advisor. Heikkila also sought nominal and punitive damages from Defendants for their alleged violation of his constitutional and statutory rights. *Doc. 2-1, at 9*.

2

Defendants filed a Motion for Summary Judgment, a Brief in Support, and a Statement of Undisputed Facts. *Docs. 37, 38 & 39.* Heikkila filed a Response, two Briefs in Support, and a Statement of Facts. *Docs. 41, 42, 43 & 44.* [1]

In their summary judgment papers, the parties indicate that they have now resolved all of Heikkila's claims regarding: (1) the headdress, headband and eagle feather; (2) the use of a ceremonial pipe and tobacco;[2] and (3) a NAR religious advisor. *Doc. 38, at 4; Doc. 39, at 5-6; Doc. 42, at 1-2.* Thus, Heikkila's only remaining constitutional and statutory claims rest on his contention that, in denying him the right to construct and use a sweat lodge, Defendants have violated his rights under RLUIPA, the First Amendment's Free Exercise Clause and the Fourteenth

---

[1] Summary judgment is appropriate when the record, viewed in a light most favorable to the nonmoving party, demonstrates that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 249-50 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex*, 477 U.S. at 323. Thereafter, the nonmoving party must present specific facts demonstrating that there is a material dispute for trial. *See* Fed. R. Civ. P. 56(c); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011).

[2] Heikkila states that the ceremonial pipe issue is only "tentatively" resolved, and he seeks the Court's assistance in "clarifying the Defendants' agreement to allow inmates use of a ceremonial pipe and tobacco for religious purposes." He believes that the agreement is ambiguous because it states that the permitted pipe and herbal materials "must meet all ADC safety standards and comply with the Arkansas Indoor Clean Air Act," which makes it "unclear whether the ceremonial pipe service will actually go forward as stated." *Doc. 42, at 1, 18-19.*

This Court cannot provide an advisory opinion about events that might occur in the future. *See Chafin v. Chafin,* 568 U.S. 165, 172 (2013) (federal courts cannot give "opinions advising what the law would be upon a hypothetical state of facts"). Accordingly, on the current record, the Court cannot provide Heikkila with what would amount to an advisory opinion on the ceremonial pipe issue. If and when that issue becomes a concrete controversy, Heikkila will be required to exhaust his administrative remedies before raising that issue in a new § 1983 action.

Amendment's Equal Protection Clause. *See Doc. 37, Ex. AA ¶ 4* (Heikkila 11/20/17 Decl.) ("I continue to seek the Court's assistance in obtaining a sweat lodge. All other issues have been resolved by the parties as reflected by the terms of this declaration.").

Accordingly, because all of Heikkila's claims, except those related to his alleged right to construct and use a sweat lodge in the practice of NAR, have now been resolved, those claims are moot and should be dismissed, without prejudice.

## II.  Relevant Facts Surrounding Heikkila's Claims

Based on the supporting Declarations, Affidavits, Deposition Testimony, and allegations in Heikkila's pleadings, the relevant *material* facts, none of which are contested, are as follows:

1.     Heikkila, a Native American of Chippewa descent, has been an ADC inmate since 2002. He was convicted of rape and incest and is serving a forty-five year sentence.  *Doc. 37, Ex. A at 8-9 & 16* (Heikkila Dep.) & *Ex. U* (Heikkila Pen Pack); *Doc. 41, Ex. 1 ¶ 2* (Heikkila 12/12/17 Decl.).

2.     He is currently incarcerated in the ADC's Varner Unit, a maximum security facility. *Doc. 37, Ex. D ¶ 7* (Watson Decl.).

3.     On July 10, 2016, Heikkila notified the ADC that he was changing his religious affiliation to NAR. Thereafter, the ADC recognized that his new religious affiliation was with NAR. *Doc. 37, Ex. I* (Religious Affiliation Update).

4.      Only a handful of inmates at the Varner Unit currently practice NAR. In addition to himself, Heikkila identifies three others (Winston Holloway, Billy Fletcher and Kristian Jordan), and Defendants refer to a fourth Varner Unit prisoner, Jesse Furr. *Doc. 37, Ex. C ¶ 17* (Mayfield Decl.)*; Doc. 42, at 16.*

5.      On July 25, 2016, Heikkila filed a formal grievance seeking access to "the essentials" for practicing NAR: a NAR advisor; a sweat lodge; ceremonial pipes and tobacco; ceremonial headdresses/headbands; and an eagle feather. *Doc. 37, Ex. B at 1* (Grievance VU-16-819).

6.      On August 8, 2016, Defendant Watson (who was then the Varner Unit warden) responded to Heikkila's grievance, stating that Defendant Mayfield (the ADC's Administrator of Chaplaincy Services) "advise[d] that your requested accommodations cannot be met without undue burden on the institution and threats to the good order and security of the institution." *Doc. 37, Ex. B at 2.* Heikkila appealed. On August, 17, 2016, the ADC deputy director found Heikkila's appeal to be "without merit." *Id., Ex. B at 3.*

7.      On September 22, 2016, Heikkila initiated this lawsuit. *Doc. 2-1.*

8.      On November 20, 2017, Defendant Mayfield informed Heikkila that the ADC had given him permission to acquire an eagle feather, a ceremonial headdress, and a headband. *Doc. 37, Ex. AA ¶ 2* (Heikkila 11/20/17 Decl.); *Ex. AB* (Mayfield Memo).

9.    The ADC also informed Heikkila that, when a qualified, free world NAR advisor was located, he or she would be permitted to conduct ceremonial pipe services with Varner Unit NAR inmates in the presence of ADC security staff.[3] *Doc. 37, Ex. AA ¶ 3.*

10.    ADC policy allows inmates of all religious faiths to possess religious articles and literature, small religious medallions, a prayer mat or rug, and prayer/meditation beads. *Doc. 37, Ex. C ¶ 37; Ex. E ¶ 20* (Kelley Decl.)*; Ex. S* (ADC Religious Policy 625); *Ex. AB.*

11.    According to Heikkila, he is unable to "fully" and "effectively" practice his NAR beliefs without a sweat lodge, which is essential for the purification ceremonies that are an integral part of NAR. *Doc. 37, Ex. AC ¶ 5; Doc. 41, Ex. 1 ¶ 3.*

12.    In his deposition, Heikkila testified that, to have a sweat lodge at the Varner Unit, NAR inmates would need a NAR religious advisor "to instruct [them] at first," but, afterwards, NAR inmates should be allowed to conduct sweat lodge ceremonies without one. *Doc. 37, Ex. A at 17.*

13.    Two other NAR-affiliated Varner Unit prisoners stated under oath that

---

[3]According to the agreement, (1) the pipe and herbal materials to be burned during the services would be required "to meet all ADC safety standards and not violate Arkansas law"; and (2) the herbal mixture could contain up to one percent tobacco. *Doc. 37, Ex. AA ¶ 3.*

a NAR spiritual leader, "medicine man" or priest was necessary to properly construct and use the sweat lodge.[4] *Doc. 37, Ex. F ¶¶ 2, 5 & 10* (Fletcher Decl.); *Ex. W at 39-40, 45 & 65* (Furr Dep.).

14.    There are no free world NAR sponsors, NAR religious or spiritual advisors, or NAR volunteers at any ADC unit. *Doc. 37, Ex. E ¶ 16.*

15.    At no time during the tenure of Mayfield or Kelley has anyone ever volunteered or applied to be a religious advisor or spiritual leader for NAR inmates. *Doc. 37, Ex. C ¶¶ 14-15; Ex. E ¶ 17.*

16.    The ADC chaplaincy and security staff have no training or experience in NAR and are not qualified to perform NAR ceremonies or rituals. *Doc. 37, Ex. C ¶¶ 29 & 32.*

---

[4]In his Declaration, Billy Fletcher stated that: (1) "only qualified and trained medicine carriers (Medicine Men) and priests should lead Native American religious services"; (2) "it is very important for the preservation of Native American religions that only qualified medicine men or priests are running sweat lodges because they know how to properly perform the sacred ceremonies and to use native medicines that are vital parts of restoration and healing"; (3) "[w]ithout a medicine man or priest, the [ADC] cannot properly build or operate a sweat lodge or ceremonies for their Native American inmates"; and (4) "[i]ncarcerated Native Americans who have not been qualified as medicine men or priests should not lead ceremonies." *Doc. 37, Ex. F ¶¶ 2, 5, 7 & 10.* In Jesse Furr's deposition, he testified that a NAR advisor was always required to lead the ceremony in a sweat lodge, and to determine if any modifications to the "traditional" sweat lodge were acceptable. *Id., Ex. W at 39-40, 45, 65.*

While Heikkila opines that, after some instruction from a NAR advisor, he and other NAR prisoners at the Varner Unit should be able to conduct sweat lodge ceremonies, without the presence of a NAR advisor, this seems to be contrary to the generally accepted practice of NAR, as explained by Fletcher and Furr. The Court need not resolve this factual dispute because it is *not material* to the resolution of the legal issues surrounding Heikkila's claim that he has a constitutional and statutory right to construct and use a sweat lodge at the Varner Unit.

17.     Mayfield personally contacted a Native American tribal group in an attempt to find a free world religious advisor for the ADC's NAR inmates, but was unable to find any person willing to come to Arkansas to serve in that capacity. *Doc. 37, Ex. C ¶¶ 11, 16-17.*

18.     Heikkila and at least two other Native American inmates, and their families and friends, have been unable to find anyone in the free world that is willing to serve as a NAR religious advisor, spiritual leader or volunteer at the ADC. *Doc. 37, Ex. A at 15-17; Ex. F ¶ 8; Ex. W at 40.*[5]

19.     Heikkila originally sought access to a "traditional" sweat lodge, which he described as follows:

> A sweat lodge is a structure that is approximately ten to fourteen feet wide and four to six feet high. The structure is covered in blankets and tarps and contains heat and steam. The participants are in the dark to represent the womb. In the center of the sweat lodge is a hole in the dirt containing several heated rocks. The dirt is placed outside the sweat lodge, to the right, beside the path that leads to the fire. Rocks are heated in the fire pit and carried into the sweat lodge by a fire tender using a shovel, pitchfork or deer antlers. A spiritual advisor receives the rocks and places them in the center of the sweat lodge. Participants then enter the lodge where they remain in darkness while the spiritual advisor pours water and herbs over the rocks to create steam and heat. The participants sweat, sing songs, pray and smoke ceremonial pipes. The sweat ceremony lasts for 20 minutes at a time with breaks. There are several sessions on the same day lasting approximately two hours.

---

[5] According to Furr's deposition testimony in his separate § 1983 case, he: (1) began searching for an advisor in 2015 by writing to the Native American Indians Inmate Support Project; (2) has written nearly 50 letters to different people and groups, trying to find an advisor; and (3) has still been unable to locate an individual to serve as a NAR advisor. *See Furr v. Kelley,* No. 5:16cv292-SWW-BD, 2018 WL 1354790, at *4.

*Doc. 37, Ex. AC* ¶ 2 (Heikkila 11/20/17 Decl.). The sweat lodge must be constructed in such a way that the participants inside the sweat lodge can touch the earth. *Id., Ex. AC* ¶¶ 4 & 6. Heikkila initially requested access to the sweat lodge 13-17 times per year. *Id., Ex. AC* ¶ *3.*

20.    Heikkila offered to meet with Defendants to discuss options on "how a sweat lodge can be constructed and operated during ceremony, without posing unnecessary and unreasonable threats to security," but received no response. *Doc. 41, Ex. 1* ¶ *5; Ex. 15A* (Heikkila 8/7/17 Ltr.); *Ex. 15B* (Heikkila 9/10/17 Decl.).

21.    On September 25, 2017, Heikkila informed Defendants that he, and other inmates seeking to practice NAR, had agreed to accept a "non-traditional" sweat lodge, which he described as follows:

> [T]he structure could be permanently built – inside the prison compound – with wood, bricks or cement blocks, designed for about fifteen inmates. The structure would have a roof but not a floor; this would permit the participants to sit upon the earth (which is significant). In the center of the structure, a small gas or electrical heating device can be permanently installed so as not to be moved or disturbed by participants, and thermostatically controlled, that will allow the participants to pour their mixture of water with herbs, roots, and barks, etc. on a heated surface to produce steam [in the same manner that certain heating devices in some types of saunas operate (indeed, such a heating device from a sauna could possibly be utilized for the sweat lodge)]. The room would be thermostatically controlled and with exhaust fans, to maintain a constant and safe temperature; a temperature approved by the ADC's health provider. And the structure would not be completely dark; that is, there would be sufficient lighting (determined by staff) to permit staff to observe the participants by means of a window or windows.

*Doc. 41, Ex. 16* (Heikkila 9/25/17 Ltr.); *see also id.*, *Ex. 1 ¶¶ 6-7*; *Ex. 12 ¶ 12* (Fletcher 10/14/17 Decl.). Heikkila received no response from Varner Unit staff, but Defendants' counsel notified Heikkila that the proposal had been received. *Id., Ex. 1 ¶ 8.*

22.    According to Heikkila, all the material for the non-traditional sweat lodge would be donated by outside sources. *Doc. 41, Ex. 1 ¶ 7.* Heikkila also reduced his request for access to twelve times a year and said he would "consider even less." *Id., Ex. 1 ¶ 5.*

23.    According to Heikkila, until a free world NAR advisor can be located, another NAR inmate in the Varner Unit, Winston Holloway ("Holloway"), is qualified and willing to conduct NAR sweat lodge services. *Doc. 41, Ex. 1 ¶ 11.*

24.    In a supporting Affidavit, Holloway states that, while he was incarcerated in a federal prison in Pennsylvania in the 1970s, he: (1) helped construct a sweat lodge; (2) learned to conduct "the sweats and pipe ceremony, drum and social gatherings"; and (3) is "willing to participate in these things" at the ADC. *Doc. 41, Ex. 10 ¶¶ 2-3 & 14* (Holloway Aff.).

25.    According to Heikkila and Holloway, there are no special qualifications or training to become the religious leader of the sweat lodge ceremonies, and the leader does not have to be characterized as a medicine man or priest. A person "becomes a facilitator simply through personal experience, *i.e.*, by learning the

proper procedure and in volunteering for leadership." *Doc. 41, Ex. 1 ¶ 13; Ex. 10 ¶ 10.*

26.    On December 1, 2017, Holloway requested permission from the ADC to serve as a NAR "religious ceremony leader and sacred pipe carrier." Holloway claimed that he was a NAR "leader and facilitator" while he was incarcerated for "years" in Pennsylvania.[6] *Doc. 41, Ex. 17.*

27.    ADC policy provides that: (1) inmates of all religious faiths are allowed to have religious worship services; (2) "[n]o religious service will be held unless the approved free world sponsor is present and in charge"; and (3) all "denominational/ sectarian services must be *under the direction of a documented authority of that specific denomination/sect." Doc. 37, Exs. K, L & R (*ADC Religious Policies 505, 510 & 605); *Ex. C ¶¶ 21 & 24; Ex. D ¶ 21; Ex. E ¶¶ 9 & 14.*

28.    ADC policy expressly provides that "[n]o inmate shall conduct a religious service/teaching." *Doc. 37, Ex. K § A* (ADC Religious Policy 510).

29.    ADC policy provides that inmates of all religious faiths are allowed to receive visits from *approved* free world spiritual advisors/ministers, certified religious assistants, religious volunteers, volunteer training mentors, and citizen volunteers. *Doc. 37, Exs. M, N, O, P & Q* (ADC Religious Policies 410, 415, 416,

---

[6]Apparently, Holloway's request was either denied, or the ADC declined to take any action on the request.

420 & 665); *Ex. C ¶¶ 22-23 & 28*.

30.    Defendant Watson has submitted a Declaration stating that, based on his thirty-four years of correctional experience, there is an "inherent risk of danger" to inmates and staff when inmates are left unsupervised in a sweat lodge, or any other enclosed area, where it is dark and there is access to shovels, tools, smoke, steam, extreme temperatures, an open fire pit, fire-making devices, hot rocks, hot coals and deer antlers. Activities inside the sweat lodge would not be visible to security staff, and even if security cameras were installed inside the sweat lodge, they would be rendered ineffective due to the darkness and steam. *Doc. 37, Ex. D ¶¶ 17 & 19*.

31.    According to Watson, Heikkila and most of the other inmates at the Varner Unit have been convicted of serious offenses. In Heikkila's case, he was convicted of rape and incest and is serving a sentence of forty-five years. *Doc. 37, Ex. D ¶¶ 7 & 19; Ex. U*. Watson states that allowing prisoners in a maximum security prison like the Varner Unit to construct a sweat lodge and participate in religious ceremonies, without a free world religious advisor, "would pose immeasurable security risks." *Id., Ex. D ¶ 19*. According to Watson, improperly supervised sweat lodges have resulted in injury and death of participants, and fire-making devices are a danger to institutional security because "it is not uncommon to find inmates who will work diligently to start a fire in the prison to cause havoc." *Id., Ex. D ¶¶ 18, 20*.

12

32.    Defendant Kelley has submitted a Declaration stating that, until a free world NAR advisor can be located to supervise and lead the sweat lodge ceremony, Heikkila's request to construct the structure is "premature," which renders his constitutional and statutory claims moot. *Doc. 37, Ex. E ¶ 26*.

33.    Defendant Kelley also states that the construction of a sweat lodge at the Varner Unit would create a "security risk" for inmates and staff "because they would be nearly impossible to monitor." There would be increased opportunities for prison violence, inmate-on-inmate and inmate-on-staff assaults, the use of tobacco, illegal drugs, and medical problems stemming from the extreme heat. *Doc. 37., Ex. E ¶¶ 27, 29-30*. The additional security needed to monitor and provide for the safety of inmates and staff would "increas[e] the strain" on ADC personnel and financial resources; and would "pose[] too many opportunities for inherently dangerous situations – for inmates and staff – to be a tenable option for the ADC." *Id., Ex. E ¶¶ 28-29*. Because she is "unaware of any way that the ADC could safely and securely operate a sweat lodge due to the substantial security threat posed," a "total ban" on sweat lodges is the least restrictive means of resolving Heikkila's request for a sweat lodge at the Varner Unit. *Id., Ex. E ¶¶ 26 & 30*.[7]

---

[7]As will be explained later, in analyzing the applicable case law, courts have recognized that in maximum security prisons like Varner Unit, it is not difficult for a state to establish a "compelling interest" (arising from legitimate security concerns) that prohibits prisoners from constructing and using sweat lodges because complete prohibition in a maximum security prison

34.    North Carolina has a relatively large Native American population and religious spiritual leaders and volunteers to lead worship services. The ADC contacted the North Carolina Department of Public Safety-Prisons, which agreed to accept Heikkila and another ADC inmate, Gerald Davidson, both of whom were seeking greater opportunities to practice their NAR beliefs. Davidson accepted the transfer to North Carolina, but Heikkila declined. *Doc. 37, Ex. E ¶ 31.*

35.    Heikkila has never requested to use the chapel for a religious service or observation. He has never requested to pray, worship or conduct religious activities outdoors on the prison yard, where he would be in the plain view of security. *Doc. 37, Ex. C ¶¶ 38-39; Ex. D ¶¶ 22-23; Ex. E ¶¶ 21-22.*

36.    Catholic and Protestant inmates in the ADC are allowed to conduct their "purification" rites of baptism and communion. *Doc. 41, Ex. 1 ¶ 10; Ex. 3 at 1-2, 6 (Watson's Ans. to Requests for Admission Nos 2 & 6).* These "purification" rites are performed in the open, in the plain view of approved free world religious leaders and security personnel. *Doc. 37, Ex. C ¶¶ 25-26 & 28; Doc. 41, Ex. 4 at 8 (Watson's Ans. To Request for Admission No. 34).*

37.    Muslim inmates in the ADC have weekly inmate-led group services (Jumu'ah Prayer), without the presence of a free world Islamic religious advisor, and

---

is the least restrictive and only means of addressing the dangers associated with allowing prisoners in such facilities to have unsupervised access to shovels, logs, hot coals, hot rocks, deer antlers, and other potential lethal weapons.

inmate-led daily services during the month of the Fast of Ramadan. *Doc. 41, Ex. 1 ¶ 10; Ex. 6* (Mills Decl.).

38.    ADC policy provides a specific exception for Jumu'ah Prayer services, which allows them to be held without a free world sponsor or volunteer. However, all of those prayer services are conducted under the supervision of the unit chaplain, in plain view of a security officer. *Doc. 37, Ex. K ¶ C.*

39.    None of the religious services, rites, or prayer services of Catholic, Protestant or Muslim prisoners employ or require the use of shovels, logs, deer antlers, open fire pits, and hot rocks, all of which present open and notorious security concerns for prison staff and other prisoners.

### III.  Discussion

**A.    Legal Standards Governing Heikkila's Claims**

**1.    Heikkila's RLUIPA Claim**

RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person – (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a).

Under RLUIPA, Heikkila bears the initial burden of showing that the ADC has imposed (1) a substantial burden (2) on a religious exercise that is sincerely based on a religious belief. *See Holt v. Hobbs,* 135 S. Ct. 853, 862 (2015); *Native American Council of Tribes v. Weber,* 750 F.3d 742, 749 (8th Cir. 2014). RLUIPA "capaciously" defines "religious exercise" as including "any exercise of religion, whether or not compelled by, or central to, a system of religious belief. *Holt,* 135 S. Ct. at 860 (quoting 42 U.S.C. § 2000cc-5(7)(A)). Similarly, the Eighth Circuit has broadly construed "substantial burden" to mean any restriction that significantly inhibits or constrains religious expression; meaningfully curtails a person's ability to express adherence to his or her faith; or denies a person reasonable opportunities to engage in religious activities or expression. *Native American Council of Tribes,* 750 F.3d at 749-50. The "availability of alternative means" of practicing the religion is *not* a relevant consideration in determining whether an inmate's ability to engage in a particular religious exercise has been "substantially burdened." *Holt,* 135 S. Ct. at 862 ("RLUIPA's 'substantial burden' inquiry asks whether the government has substantially burdened religious exercise (here, the growing of a ½-inch beard), not whether the RLUIPA claimant is able to engage in other forms of religious exercise.").

Once Heikkila makes the required showing, the burden shifts to Defendants to establish that the restrictions on the exercise of his religion: (1) were in furtherance

of a "compelling governmental interest"; and (2) were the "least restrictive means" of furthering that interest. *Holt,* 135 S. Ct. at 862.   The least-restrictive-means standard is "exceptionally demanding" and requires a "showing that it [the government] lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting part[y]." *Id.* at 864. If a less restrictive means is available for the government to achieve its goals, "the Government must use it." *Id.* (quoting *United States v. Playboy Entertainment Group, Inc.,* 529 U.S. 803, 815 (2000)).

### 2.    Heikkila's First Amendment Free Exercise Claim

If a prisoner successfully establishes that the state has impinged his free exercise rights under the First Amendment, the state, to prevail, must show only that the impingement was "reasonably related to legitimate penological interests." *Gladson v. Iowa Dep't of Corrections,* 551 F.3d 825, 831-32 (8th Cir. 2009) (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)).[8] This means it is *easier* for a prisoner to prove a RLUIPA claim than a First Amendment free exercise claim.

---

[8] In *Turner,* the Court identified four factors that must be weighed in determining if the policy or regulation is "reasonably related to legitimate penological interests": (1) whether there is a "valid rational connection" between the policy or regulation and a governmental interest; (2) whether the inmate has an alternative means of exercising the constitutional right; (3) whether the accommodation of the inmate's asserted constitutional right would have a "significant ripple effect" on prison staff, other inmates, and prison resources; and (4) whether an alternative exists that fully accommodates the prisoner "at *de minimis* cost to valid penological interests." *Gladson,* 551 F.3d at 831 (quoting *Turner,* 482 U.S. at 89-91). With regard to the second factor, a prisoner "need not be afforded his preferred means of practicing is religion as long as he is afforded sufficient means to do so." *Id.*

### 3.     Heikkila's Fourteenth Amendment Equal Protection Claim

Finally, to establish his equal protection claim, Heikkila must show that, by banning a sweat lodge at the Varner Unit, ADC officials intentionally treated him differently from similarly situated prisoners. *Nolan v. Thompson,* 521 F.3d 983, 990 (8th Cir. 2008); *Patel v. United States Bureau of Prisons,* 515 F.3d 807, 815 (8th Cir. 2008). Because his claim involves a restriction on the free exercise of his religious beliefs, Heikkila must show that he was denied a religious opportunity that was granted to non-NAR prisoners. *See, e.g., Patel,* 515 F.3d at 815-17 (Muslim prisoner alleged that he was denied a religiously mandated halal diet while Jewish prisoners were given kosher meals); *Murphy v. Missouri Dep't of Correction,* 372 F.3d 979, 984-85 (8th Cir. 2004) (Christian Separatist prisoners alleged that they were denied permission to hold racially segregated religious services while National of Islam and Moorish Science prisoners were allowed to do so). He must also show that this differential treatment was motivated by intentional or purposeful discrimination. *Patel,* 515 F.3d at 816; *Phillips v. Norris,* 320 F.3d 844, 848 (8th Cir. 2003).

### B.     Overview of Controlling Eighth Circuit Case Law

In *Hamilton v. Schriro*, 74 F.3d 1545 (8th Cir. 1996), the Court held that a Missouri prison's prohibition on sweat lodge ceremonies did not violate the prisoner's right to the free exercise of religion under either the First Amendment or

the Religious Freedom Restoration Act ("RFRA").[9] In rejecting the RFRA claim, the Court held that, "in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations [regarding prison security], courts should ordinarily defer to their expert judgment in such matters." *Id.* at 1553 (quoting *Pell v. Procunier,* 417 U.S. 817, 827 (1974)). The Court further held that, because the prisoner asserted an all or nothing position -- if he did not have access to a sweat lodge ceremony, "he would not and could not practice his religion in any capacity" -- his case presented "the unusual situation" where the prison's outright ban on sweat lodges satisfied RFRA's "least restrictive means" requirement because no other alternatives were acceptable to the prisoner. *Id.* at 1556.

In rejecting the prisoner's First Amendment claim, the *Hamilton* Court considered the *Turner* factors and concluded that: a ban on sweat lodges was rationally connected to preventing the type of harm prison officials feared would occur in a completely enclosed area; alternative means remained open to the prisoner for exercising his religion; accommodating the request would have an adverse impact on prison staff, other inmates and prison resources; and the prisoner had not

---

[9]Although RFRA was later held unconstitutional, its "compelling governmental interest/least restrictive means" standard was carried over in the enactment of RLUIPA. *Cutter v. Wilkinson*, 544 U.S. 709, 717 (2005).

identified an alternative that fully accommodated his rights at *de minimis* cost to valid penological interests. *Id.* at 1551.

Twelve years later, this time under RLUIPA, the Court revisited the issue of whether a maximum security prison in Missouri could ban prisoners from constructing a sweat lodge for use in NAR ceremonies. *Fowler v. Crawford,* 534 F.3d 931 (8th Cir. 2008). In holding that the ban did not violate RLUIPA, the Court considered the safety and security concerns of the prison staff and emphasized that RLUIPA is to be applied with "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline." *Id.* at 937. Applying these principles, the Court concluded that the prison officials had met their burden of demonstrating: (1) that a sweat lodge ban was in furtherance of a compelling governmental interest; and (2) a ban was the least restrictive means by which to further the compelling interest in safety and security. *Id.* at 942. As in *Hamilton,* the prisoner rejected religious alternatives to a sweat lodge that were suggested by prison officials. In doing so, the Court held that:

> [T]he pertinent query is whether a federal appeals court, far removed from the realities of institutional life at JCCC, or state prison officials – well familiar with (1) the size and nature of JCCC's population, (2) the staffing problems and budgetary restrictions under which they labor, and (3) the various religious practices they are asked to accommodate – is best suited to make such a decision. … When we are presented only with disputes regarding professional judgment, "our

inferences must accord deference to the views of prison authorities'" where those views rest on more than mere speculation and conjecture.

*Id.* at 943.[10]

### C.    Analysis of Heikkila's RLUIPA and First Amendment Free Exercise Claims

### 1.    Heikkila Has Met His Threshold Burden Under RLUIPA and the First Amendment.

Under RLUIPA, Heikkila has the initial burden of showing the exercise of his

religious beliefs is being "substantially burdened" by the ADC's refusal to allow the

---

[10]In the Eastern District of Arkansas, two courts have recently considered similar claims by Varner Unit prisoners that the ban on sweat lodges violates RLUIPA, the First Amendment and the Fourteenth Amendment. In *Fletcher v. Kelley,* No. 5:16cv00201-BSM-JJV, 2018 WL 1251918 (E.D. Ark. Mar. 12, 2018), Judge Miller granted defendant's motion for summary judgment on Billy Fletcher's First Amendment, RLUIPA and equal protection claims arising from being denied the right to construct a sweat lodge at the Varner Unit. Judge Miller held that, because Fletcher "flatly rejected [sweat lodge] alternatives that did not involve, fire, darkness, and a structure constructed out-of-doors with willow poles," the disposition of his RLUIPA and First Amendment claims on this issue was controlled by *Hamilton* and *Fowler*. He further rejected Fletcher's last-minute attempt to create a factual dispute by suggesting he would be open to alternatives to a traditional sweat lodge and held that, even if Fletcher's "attempts at compromise" were considered, his proposed "state of the art" alternative was "hardly a practical one." *Id.,* at *1-2.

In *Furr v. Kelley,* No. 5:16cv00292-SWW-BD, 2018 WL 1352156 (E.D. Ark. Mar. 15, 2018), *appeal filed* (8th Cir. Mar. 29, 2018) (No. 18-1663), Judge Wright granted summary judgment to ADC officials on Jesse Furr's RLUIPA, First Amendment and equal protection claims. Unlike the prisoners in *Hamilton, Fowler* and *Fletcher,* Furr was willing to compromise with the ADC in any way possible related to the construction of a sweat lodge at the Varner Unit, *as long as a NAR religious advisor approved the compromises*. This led the Court to conclude that all of Furr's claims were "premature," which meant he was requesting an "advisory" opinion "because here … there are currently no advisors – free world or inmate – who can and will agree to serve as an advisor. … Only if and when a willing and able advisor is located does the constitutionality and statutory validity of the ban come into question." *Id.,* 2018 WL 1354790, at *7. The Court also held that: (1) The ADC policy, requiring an advisor to be present during any NAR religious ceremonies, did not result in a RLUIPA or constitutional violation, *id.* *4-5, 8; and (2) "[T]he issue of whether the requirement that the advisor be a free-world person is not currently before the Court." *Id.* at *6.

construction of a sweat lodge at the Varner Unit. According to Heikkila, he cannot fully and effectively practice his NAR beliefs without a sweat lodge. Defendants do not dispute the sincerity of his belief that a sweat lodge is an integral part of NAR. The Court has no hesitation in finding that Heikkila is seeking to construct and use a sweat lodge as a "religious exercise" under RLUIPA, and that it is based on his sincerely held religious belief. *See Yellowbear v. Lampert,* 741 F.3d 48, 56 (10th Cir. 2014) ("No one questions . . . that access to a sweat lodge is a form of religious exercise for Mr. Yellowbear, or indeed for many who share his faith tradition."); *Werner v. McCotter,* 49 F.3d 1476, 1480 (10th Cir. 1995) ("We may take judicial notice of the central and fundamental role played by the Sacred Sweat Lodge in many Native American religions.").

The Court also concludes that Heikkila has met his RLUIPA burden of showing that a reasonable fact-finder could determine that the ADC's ban on the construction and use of a sweat lodge at the Varner Unit "substantially burdens" his ability to practice his NAR beliefs.[11]

---

[11]*See Native American Council of Tribes,* 750 F.3d at 749-50 ("complete ban" on tobacco was "substantial burden" under RLUIPA because it "meaningfully curtailed the [Native American] inmates' ability to express adherence to their faith"); *Yellowbear,* 741 F.3d at 56 (RLUIPA's substantial burden requirement was met where prison's refusal to allow death-row prisoner access to a sweat lodge "flatly prohibit[ed] [him] from participating in an activity motivated by a sincerely held religious belief"); *see also Davila v. Gladden,* 777 F.3d 1198, 1205 (11th Cir. 2015) (holding that prison officials "substantially burdened [a prisoner's] religious exercise by flatly preventing him from having his beads and shells"); *Merced v. Kasson,* 577 F.3d 578, 590 (5th Cir. 2009) ("[A]t a minimum, the government's *ban* of conduct sincerely motivated

Finally, regarding Heikkila's First Amendment claim, the Court concludes that Heikkila has met his threshold burden of establishing that the ADC's ban on a sweat lodge at the Varner Unit infringes a central tenet of his NAR religion.

### 2. Defendants Are Entitled to Prevail on Heikkila's Claims Under RLUIPA and the First Amendment.

Because Heikkila has met his threshold burden under RLUIPA, the burden shifts to Defendants to show that the decision not to allow Heikkila to construct and use a sweat lodge at the Varner Unit: (1) was in furtherance of a "compelling governmental interest"; and (2) was the "least restrictive means" of furthering that interest. As to his First Amendment claim, the burden also shifts to Defendants to establish, under *Turner,* that the ban is "reasonably related to legitimate penological interests."

Defendants argue that, based on Defendants' declarations and other evidence in the record, the ADC's decision to ban the construction and use of a sweat lodge at the Varner Unit: (1) met RLUIPA's "compelling governmental interest/least

---

by religious belief substantially burdens an adherent's free exercise of that religion."); *Greene v. Solano County Jail,* 513 F.3d 982, 988 (9th Cir. 2008) ("We have little difficulty in concluding that an outright ban on a particular religious exercise is a substantial burden on that religious exercise.").

restrictive means" test; and (2) passes First Amendment muster because it is "reasonably related to legitimate penological interests," as required under *Turner*. [12]

In her Declaration, ADC Director Kelley states that Heikkila's request for a sweat lodge is "premature" because there is no free world NAR advisor to supervise the construction of a sweat lodge at the Varner Unit and then oversee the purification ceremonies using the sweat lodge. To support her position, Kelley cites the ADC policy which explicitly requires all religious groups to have a free world religious advisor.

Kelley goes on to assert that, even if a free world NAR advisor was not required by ADC policy, the ban on a sweat lodge at the Varner Unit would still be necessary because she is "unaware of any way that the ADC could safely and securely operate a sweat lodge due to the substantial security threat posed." According to Kelley and Warden Watson, those security concerns are as follows: (1) the Varner Unit is a maximum security facility which houses inmates who have been

---

[12]Defendants also make a number of secondary legal arguments: (1) they are entitled to sovereign immunity on Heikkila's official-capacity claims for monetary damages; (2) Heikkila's claims for injunctive or declaratory relief are moot or not supported by the evidence; (3) they are entitled to qualified immunity on his individual-capacity claims for damages; (4) Heikkila's damages claims are barred by the Prison Litigation Reform Act's "physical injury" requirement; and (5) Heikkila's claims are improperly based on a respondeat superior theory. Because the Court concludes that Heikkila has failed to establish a constitutional or statutory violation, it need not reach any of these arguments. *See A.H. v. St. Louis County,* 891 F.3d 721, 726-27 (8th Cir. 2018) (qualified immunity need not be addressed on summary judgment where plaintiffs failed to establish a constitutional violation).

convicted of "serious felonies"; (2) the "inherent risk of danger" to inmates and staff in having unsupervised inmates in a sweat lodge, or any enclosed area, with access to shovels, deer antlers, smoke, steam, a fire pit and fire-making devices, extreme temperatures, hot rocks and coals; (3) the lack of visibility of prisoners in the sweat lodge to security staff; (4) the ineffectiveness of installing security cameras inside the sweat lodge due to darkness and steam; (5) monitoring a sweat lodge would be "nearly impossible"; (6) increased opportunities for violence, inmate-on-inmate and inmate-on-staff assaults, the use of illegal drugs and tobacco; (7) medical problems stemming from exposure to extreme heat; and (8) the increased strain on ADC personnel and financial resources.

In his Response, Heikkila argues that, until a NAR religious advisor is located, Holloway, a fellow NAR inmate in the Varner Unit, is qualified and willing to preside over the construction of the sweat lodge and the performance of purification ceremonies. *Doc. 42, at 7-8.* He also argues that Defendants' security concerns are "exaggerated" and can be eliminated by his proposal to construct a "non-traditional" structure, which *he describes* as being more akin to a Scandinavian sauna than a Native American sweat lodge. *Id. at 2-12, 16-18.* Finally, he argues that, because of his willingness to accept something less than a "traditional" sweat lodge, the ADC's denial of his requested accommodation is not the "least restrictive means" demanded by RLUIPA. *Id. at 13-16.* He contends that, because material factual issues exist

regarding each of his arguments, Defendants' Motion for Summary Judgment must be denied.

Simply put, none of Heikkila's arguments can withstand legal scrutiny. First, Holloway's Affidavit contains only a serious of vague and conclusory statements about his alleged experience in constructing a sweat lodge and acting as a NAR leader while he was a prisoner, many years ago, at a federal prison in Pennsylvania. Heikkila's suggestion that one of his friends and fellow NAR member (whose alleged "qualifications" are wholly undocumented) can "stand in" for a free world NAR leader fails to address any of the obvious and compelling security concerns arising from Holloway *designing* the sweat lodge (perhaps with hidden tunnels, weapons buried or hidden in construction materials, etc.) and then *supervising* the activities *he decides* are appropriate for his friends to engage in once inside the sweat lodge and outside the presence of guards.

Second, the "non-traditional" structure that Heikkila describes as an "accommodation" fails the straight face test. Even cursory research on NAR makes it clear that sweat lodges must use and incorporate items *from nature*, which include a fire pit where wood is burned to heat stones that are taken inside the lodge to produce steam after water is poured over them. Heikkila's proposed accommodation (which basically involves the construction of a modern electric or gas sauna) would be made from "wood, bricks, or cement blocks," and equipped with a "thermostat,"

and "exhaust fans" and "lighting (determined by staff) to permit staff to observe the participants by means of a window or windows." Assuming a NAR advisor could be located for the Varner Unit, it defies credulity to believe such a person would bless the construction of the type of modern structure proposed by Heikkila. Suffice it to say, Heikkila's vision of a "non-traditional" sweat lodge violates every important principle for constructing a Native American sweat lodge. Heikkila is certainly free to worship NAR, but he is not permitted to hoodwink the Court by distorting the most basic tenets of his religion to strengthen his RLUIPA and constitutional claims.

Finally, after proposing his fanciful vision of a "non-traditional" sweat lodge, Heikkila *admits* that actual construction would have be delayed because "[a]ll the material would [have to] be donated by outside sources." *Doc. 41, Ex. 1 ¶ 7*. He states no opinion on how many years it might take for the donated materials to arrive so that construction could begin.

Suffice it to say, nothing about Heikkila's proposed religious accommodation (a "non-traditional" sweat lodge) would address or resolve any of the ADC's legitimate and compelling security concerns and is predicated on a structure that is entirely hypothetical because there is no source in sight to fund its construction. Certainly, nothing about Heikkila's pie in the sky arguments create any disputed issues of *material fact* relevant to the legal analysis of his RLUIPA and constitutional claims.

It is undisputed that, despite efforts by Defendant Mayfield, Heikkila and other NAR inmates at the Varner Unit, *no free world NAR spiritual leader or advisor has been located to supervise the construction of the sweat lodge and, later, to supervise the purification ceremonies using that structure*. Heikkila does not contend that Defendants have obstructed or hindered his efforts or the efforts of other prisoners to obtain a free world advisor.[13] Furthermore, he conceded in his deposition that, to have a sweat lodge, NAR inmates would need a NAR religious advisor "to instruct [them] at first." *Doc. 37, Ex. A at 17*. Two other NAR inmates at the Varner Unit also agree that their religious beliefs require the guidance of a NAR spiritual leader to construct the sweat lodge and then preside over the religious ceremonies using the sweat lodge. (*See* fn 4, *supra*, at p. 7).  Finally, Heikkila *admits* that his proposed religious accommodation of a "non-traditional" sweat lodge has not yet been approved by a NAR religious adviser and, *if* approved, it can only be constructed after the donation of all the required materials for construction, which may mean *never*.

Faced with similar facts in *Furr,* the court held that neither the Constitution

---

[13]The law is clear that, under the First Amendment, prisons are not required to provide advisors or clergy for every religion, denomination or sect that exists; rather, their obligation is to provide a reasonable opportunity for prisoners to exercise their religion. *Cruz v. Beto,* 405 U.S. 319, 322 (1972); *Blair-Bey v. Nix,* 963 F.2d 162, 163 (8th Cir. 1992). Although the law under RLUIPA is not as developed on this issue, several courts have held that the lack of a religious advisor does not "substantially burden" an inmate's religious exercise where, as here, the lack of an advisor is due to unavailability of volunteers. *See Adkins v. Kaspar,* 393 F.3d 559, 571 (5th Cir. 2004); *Furr,* 2018 WL 1354790, at *4-5; *Fletcher,* 2017 WL 9771803, *5-6.

nor RLUIPA was violated by the ADC's requirement that a NAR advisor be present to supervise the sweat lodge ceremonies:

> Looking again at the *Turner* factors, the prison's requirements that an advisor be involved (to conduct the sweat lodge rite), who is trained in working with hot lava rocks, steam, and high temperatures, is for obvious reasons rationally related to the prison's interest in the health and safety of inmates and staff. As previously discussed, Mr. Furr has alternative means of practicing his religion.
>
> Mr. Furr acknowledges, based on his understanding of the Native American religion, that he must have an advisor to participate in a sweat lodge ceremony. It is a requirement of the religion and not just a prison requirement that an advisor be present to operate the sweat lodge. Requiring an advisor to conduct a sweat lodge is not only reasonably related to legitimate penological interests, it is the least restrictive alternative available at the present.

*Furr,* 2018 WL 1354790, at *8. Thus, the court held it could not reach the constitutional and statutory validity of the ADC's ban on sweat lodges at the Varner Unit because "there are currently no advisors – free-world or inmate -- who can and will agree to serve as an advisor," which made any decision on the constitutional and statutory issues raised by the ban "premature and advisory." *Id.* at *7.

To avoid the same outcome in *Furr,* Heikkila contends that his friend and fellow NAR follower, Holloway, is qualified and willing to fulfill the role of NAR spiritual leader for the Varner Unit until a free world advisor can be located. Of course, Heikkila's argument seeks an accommodation that is flatly prohibited by ADC policy: "No inmate shall conduct a religious service/teaching." *Doc. 37, Ex. K § A.*

The Eighth Circuit has not addressed whether RLUIPA is violated by a prison's policy that requires a free world advisor or sponsor for religious services and activities. However, more than thirty years ago, in *Tisdale v. Dobbs,* 807 F.2d 734 (8th Cir. 1986), the Court explicitly held that no First Amendment violation arose from the ADC's "refusal to allow Muslim inmates to conduct religious services except under the leadership of an approved free-world sponsor." *Id.* at 736. In granting summary judgment to ADC officials, the Court held that the officials' affidavits were "adequate to show that unsupervised group religious meetings posed a potential threat to a legitimate penological objective," including the concern that such meetings could become "forums for dissension and unrest." *Id.* at 738, 740.

Many other courts have recognized that prison officials have legitimate interests in preventing unsupervised religious group activities, and in preventing inmates from holding leadership roles within a religious group, in order to maintain security and discipline within the prison. *See, e.g., Kemp v. Liebel,* 877 F.3d 346, 353–54 (7th Cir. 2017) ("[O]ur precedent suggests that prison officials 'need not … allow inmates to conduct their own religious services' so long as the delay in offering services by qualified leaders is reasonable.")*; Baranowski v. Hart,* 486 F.3d 112, 120-21, 123-25 (5th Cir. 2007) (no First Amendment or RLUIPA violation from prison policy prohibiting Jewish inmates from holding religious services without assistance of a rabbi or approved outside volunteer); *Shabazz v. Arkansas Dept. of*

*Corr.,* 157 Fed. Appx. 944, 945 (8th Cir. 2005) (recognizing that "prison security may be jeopardized if an inmate is put in a position of religious leadership over other inmates, or if an inmate has the opportunity to use religious services to engage in disruptive communications"); *Adkins v. Kaspar,* 393 F.3d 559, 564, 571 (5th Cir. 2004) (no First Amendment or RLUIPA violation where inmate-members of a religious group were not permitted to assemble on certain days "because no volunteer deemed acceptable by defendants was available to supervise the meetings," which was due to the "dearth of qualified outside volunteers," rather than a prison rule or regulation); *Spies v. Voinovich,* 173 F.3d 398, 405-06 (6th Cir. 1999) (no First Amendment violation because prison's "prohibition on inmate-led groups necessarily exists to avoid the risks that would arise from unsupervised inmate activity and the creation of an alternate, inmate-led power structure and thus, clearly, has a valid rational connection to [the prison's] interest in maintaining prison security"); *Anderson v. Angelone,* 123 F.3d 1197, 1199 (9th Cir. 1997) ("Requiring an outside minister to lead religious activity among inmates undoubtedly contributes to prison security."); *Cooper v. Tard,* 855 F.2d 125, 129 (3d Cir. 1988) (recognizing that prison had a "legitimate governmental interest" in prohibiting inmates from conducting group religious services, under the leadership of an inmate they recognized as "the Imam," because "what plaintiffs did was establish a leadership structure within the prison alternative to that provided by the lawful authorities and

contrary to the very purposes of the MCU," which "posed a potential threat to prison authority that caused reasonable concern among defendants").

Thus, in denying Heikkila's request to construct and use a sweat lodge at the Varner Unit, the Court concludes that Defendants have met their burdens, under both RLUIPA and the First Amendment. Because Defendants have satisfied the "compelling governmental interest/least restrictive means" test, in refusing to allow a sweat lodge at the Varner Unit, and, this decision is "reasonably related to legitimate penological interests," the Court's analysis is at an end.

Finally, until a free-world religious advisor can be located, the issues of "exaggerated" security concerns and the feasibility of a "non-traditional" sweat lodge are not ripe for this Court's determination.

Accordingly, the Court concludes that Defendants are entitled to summary judgment on Heikkila's claims that the ADC's sweat lodge ban violates his rights under RLUIPA and the First Amendment, and those claims should be dismissed, with prejudice.

### D.    Heikkila's Fourteenth Amendment Equal Protection Claim

Finally, Heikkila argues that, by denying him the opportunity to use a sweat lodge, Defendants have treated him, as a member of NAR, less favorably than ADC inmates of other religious faiths, in violation of the Equal Protection Clause.

Heikkila has come forward with no evidence from which the Court might infer that Defendants' asserted reasons for its ban on a sweat lodge at the Varner Unit are a pretext for discrimination. It is undisputed that the primary reason for any differential treatment of NAR inmates is based on: (1) the unavailability of NAR spiritual leaders and volunteers, in contrast to the many religious leaders and volunteers for Protestants, Muslims and Catholics; (2) the sweat lodge purification ceremony being conducted inside a closed structure, which prevents security personnel from observing the prisoners; and (3) NAR prisoners having access to shovels, hot coals, hot rocks, deer antlers, and other items during the purification ceremony that could be used as lethal weapons, in stark contrast to the analogous ceremonies of Protestants, Catholics and Muslims, all of which are conducted in plain view of security guards, without any religious accoutrements that might be deemed to be lethal weapons. Heikkila has offered *no* evidence that would allow a reasonable fact-finder to conclude that he was denied access to a sweat lodge because of intentional discrimination.[14]

---

[14]The ADC policy of prohibiting inmate-led religious services does make a specific exception for Jumu'ah Prayer meetings. However, Heikkila has presented no evidence from which a fact-finder could conclude that these prayer meetings are sufficiently "similar" to the circumstances surrounding a sweat lodge ceremony to give rise to an equal protection claim.

Accordingly, Defendants are also entitled to summary judgment on Heikkila's claims that the ADC's sweat lodge ban violates his equal protection rights under the Fourteenth Amendment, and that claim should be dismissed, with prejudice.

### IV. Conclusion

IT IS THEREFORE RECOMMENDED THAT:

1.     The Motion for Summary Judgment filed by Defendants Wendy Kelley, Randy Watson and Joshua Mayfield (*Doc. 37*) be GRANTED.

2.     This § 1983 action be DISMISSED, WITH PREJUDICE, in its entirety.

DATED this 27th day of August, 2018.

_____
UNITED STATES MAGISTRATE JUDGE